UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

GRANDE VISTA, LLC and
PAUL LUTOV,

     Plaintiffs,

     v.

UNITED STATES OF AMERICA,

     Defendant.

Civil Action No. TDC-20-0616

## MEMORANDUM OPINION

Plaintiffs Grande Vista, LLC and Paul Lutov have filed a civil action against the United States of America under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671–2680 (2018), in which they allege trespass and nuisance arising from an incident in which a United States Air Force ("USAF") fighter jet experiencing a flight emergency jettisoned fuel tanks that landed on their property. The parties have filed Cross Motions for Summary Judgment, which are fully briefed. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, the Cross Motions for Summary Judgment will be GRANTED IN PART and DENIED IN PART.

## BACKGROUND

### I.    The Property

Paul Lutov is the managing member of Grande Vista, LLC, a Maryland limited liability company that owns an 18.75-acre parcel of land located in Fort Washington, Maryland ("the Property"). Lutov purchased the property in 2001 for $500,000. On August 13, 2007, the Property was appraised at a market value of $5 million.

The Property is zoned "Rural Residential," or "R-R," a residential category that permits single family detached housing on lots with a minimum size of 20,000 square feet but also would permit the development of an assisted living facility on the site upon approval of a special exception. Plaintiffs planned to seek such a special exception to build a development to be designated as a "medical/residential" development and to include an independent senior living community with a medical care facility on site. To qualify for such an exception and to be permitted to have unlimited density on the Property, the site would have to contain 25 or more acres of contiguous land. Accordingly, Plaintiffs planned to purchase three additional parcels of land adjacent to the Property, totaling 6.25 acres, for a total of 25 contiguous acres.

## II.     The Fuel Tanks

On April 5, 2017, a USAF F-16 jet experienced an in-flight emergency, which forced the pilot to jettison two external fuel tanks and then eject from the aircraft. Prior to jettisoning the fuel tanks, the pilot dumped the fuel from the external tanks in accordance with governing aviation standard operating procedures. Steve Richards, the former Chief of Environmental Management of the USAF Civil Engineering Squadron at Joint Base Andrews in Maryland, has asserted that after the fuel was emptied from the external tanks, they retained only "minor amounts" of residual fuel. Joint Record ("J.R.") 256, ECF Nos. 73-2, 73-3. The first fuel tank landed on the Property. The second fuel tank landed on a nearby property.

## III.    Remediation Efforts

On or about May 30, 2017, the USAF hired a contractor, H-1 Cadence, Joint Venture, LLC ("the Contractor"), to remediate any contamination of the affected area. Richards served as the liaison between the USAF and the Contractor but did not oversee or supervise its activities. The Contractor was required to provide all necessary personnel, supervision, labor, transportation,

2

equipment, and materials to "perform all operations necessary to remediate and revitalize the main F-16 crash site and two (2) fuel cell locations." J.R. 262.  The Contractor's required remediation activities consisted of:  (1) excavating and expanding the crater formed by the crash to recover remaining aircraft debris; (2) sampling the soil to determine the boundaries for remediation; (3) removing and disposing of soil containing contaminants of potential concern, including benzene, toluene, ethylbenzene, xylene, thin-layer chromatography volatile organic compounds ("TLC VOCs"), total petroleum hydrocarbon diesel range organics ("TPD-DROs"), and hydrazine; (4) remediating any soil contaminated with xylene, TLC VOCs, TDP-DROs, and hydrazine; (5) sampling the soil at locations outward from the crater until the appropriate number of "non detection" samples were achieved or samples were below screening levels; (6) replacing all soil containing contaminants with certified clean fill and providing a top layer of wood chippings for soil stabilization and ground cover; and (7) sampling and testing groundwater in the immediate area beneath the landing site for all appropriate chemicals of potential concern, including xylene, TLC VOCs, TDP-DROs, and hydrazine.  On October 2, 2017, the Contractor completed its remediation efforts.

At that point, the Contractor hired a subcontractor, Ace Environmental Services, LLC ("Ace Environmental"), to conduct final samples of the soil at and around the landing site.  On October 27, 2017, Ace Environmental issued a report stating that the levels of benzene, toluene, ethylbenzene, total xylenes, methyl tert-butyl ether ("MTBE"), naphthalene, TPH-DROs, and total petroleum hydrocarbon gasoline range organics ("TPH-GROs") in the soil samples were all well below the residential standards set by the Maryland Department of the Environment ("MDE").  Specifically, the report concluded that "[t]he soil sampling results indicated that the soil samples collected were below" the MDE standards.  J.R. 336.  The report further concluded that "no

3

additional action is recommended." *Id.* As a result, on April 17, 2018, the MDE's Oil Control

Program issued a letter closing its case on April 5, 2017 fuel tank incident.

## IV.   Expert Witnesses

Despite the USAF's remediation efforts, Plaintiffs maintain that soil and groundwater on

the Property remain contaminated. Plaintiffs retained an expert witness, Ronald B. Wildman, a

Consultant at Forenvicon, Inc., to assess whether there is persisting contamination at the Property.

Wildman relied on additional testing of samples of soil and groundwater from the Property and

surrounding areas conducted by Earth Data Incorporated ("Earth Data") and Water Testing

Laboratories of Maryland, Inc. ("Water Testing Laboratories"). Wildman reviewed Earth Data's

report containing its findings and drafted his own expert report offering his conclusions. Earth

Data's report containing the underlying data is not in the record.

According to Wildman, numerous volatile organic compounds ("VOCs") and polycyclic

aromatic hydrocarbons ("PAHs") remain present in both the soil and the groundwater on the

Property and in a well located on a neighboring property ("the Adjacent Property"). With respect

to the soil, Wildman asserts in his report that these chemicals are present at "elevations well below"

the nine-foot depth below the surface that the Contractor reported constituted the extent of any

contamination. Wildman Report at 1, Pls.' Reply Brf. Ex. 2, ECF No. 71-3. Specifically, Wildman

states that "Earth Data measured levels of 0 ppm down [through] the imported fill material until

[it] reached 9 feet [below surface level], then the PID readings instantaneously shot up to a range

of 99 to 167 ppm." *Id.* at 2. According to Wildman, there are "multiple regulated and detectable

contamina[nts], at a depth of 14 feet and beyond" and there is "no way that contaminant levels

were below MDE clean-up standards immediately after clean-up at a depth of only 9 feet." *Id.*

Wildman further states that a representative of Earth Data, Jeff Chipman, smelled the "strong

4

aroma of the vapors" upon retrieving the samples from approximately nine feet below surface level. *Id.*

As to the groundwater, Wildman asserts that "laboratory analysis of [the] groundwater" detected cyclohexane, methylcyclohexane, and total xylenes. *Id.* He further contends that, although the VOCs and PAHs detected were present at levels below the MDE and United States Environmental Protection Agency ("EPA") limits, they were still present. According to Wildman, the presence of these chemicals "strongly implies" that these chemicals "still exist" at levels between 14 feet and 26.12 feet below the surface. *Id.* Wildman further asserts that these chemicals are "poisoning" the groundwater. *Id.*

Wildman also states that in July 2021, the chemical toluene was identified in the groundwater at the bottom of the well on the Adjacent Property, approximately 150 feet way from the landing site on the Property. Wildman contends that this toluene likely flowed from the landing site to the well.

The Government also retained an expert witness, Dr. Remy Hennet, a Senior Principal at S.S. Papadopulos & Associates, Inc. who has a Ph.D. in geochemistry, to conduct further analysis on whether there is ongoing contamination at the Property. Dr. Hennet reviewed the results of the 2017 tests of soil samples conducted by Ace Environmental and the results of 2021 tests of groundwater samples conducted by Water Testing Laboratories requested by Wildman. Based on his review, Dr. Hennet has concluded that the "soil cleanup was completed to the satisfaction of the state regulators" and "there is no data to indicate persisting soil contamination from the release of fuel at the landing site." J.R. 193. Consistent with these conclusions, the Ace Environmental soil test results had findings of non-detection for all tested contaminants. In particular, cyclohexane, methylcyclohexane, and xylenes were not detected in the soil. The Water Testing

5

Laboratories groundwater test results showed non-detection for all tested contaminants except toluene. In particular, benzene, ethylbenzene, xylenes, and naphthalene were not detected in the groundwater.

The parties agree that toluene was detected in the sample of groundwater taken from the bottom of the well on the Adjacent Property. Toluene is a component of petroleum products, including jet fuel, diesel fuel, home heating oil, and gasoline, and is also used as a solvent for paints, coatings, gums, oils, and resins. Toluene found in the environment can also be the result of natural processes, such as the "decomposition of dead organic materials in stagnant water." J.R. 195. According to Dr. Hennet, when present in petroleum products, toluene is present with other compounds that include benzene, ethylbenzene, xylenes, and naphthalene. Dr. Hennet asserts that the absence of those chemicals in the water samples "is a strong indicator that the trace-level of toluene did not originate from a fuel spill." *Id.* In contrast, Dr. Hennet notes that, based on photographs he reviewed, the bottom of the well in which the toluene was found was "partially open to the elements" and accessible to "small animals," such that debris could accumulate, settle, and decompose at the bottom the well. *Id.*

According to the results of the tests conducted by Water Testing Laboratories, there were 4.4 micrograms of toluene per liter of groundwater in the affected sample. Under federal and state law, the maximum contaminant level for toluene is 1,000 micrograms per liter for the water to be considered safe to drink.

## V.    Continuing Development Plans

Following the April 2017 incident, in furtherance of the efforts to develop the Property as an assisted living facility, Plaintiffs retained Marcus & Millichap Capital Corporation, a real estate investment firm, to provide a valuation of the Property to be used in seeking financing for the

project. In November 2018, Marcus & Millichap issued a report that estimated the value of the Property to be $6,562,500 based on the assumption that the Property would ultimately be sufficiently remediated after the fuel tank incident to allow for such development, and that it would be combined with three adjacent parcels to create a 26.85 acre property to be used for development with a total value of $7,827,500.

Plaintiffs also continued their efforts to purchase the three adjacent parcels of land that they believed to be required to obtain the special exception needed for the development of the assisted living facility. As of May 19, 2018, Plaintiffs had obtained commitments for the sale of two of the three adjacent parcels of land, but "efforts to obtain commitment for the third parcel" of land were "on hold, pending resolution of the site's environmental status." Rosenberg Report at 3, Pls.' Mot. Summ. J. Ex. 2, ECF No. 65-2. The third parcel of land for which Plaintiffs have not been able to obtain a commitment for sale is the Adjacent Property, on which the well containing toluene sits.

On March 22, 2021, Plaintiffs entered into a contract to sell the Property for $3.9 million. However, the buyer ultimately rescinded the offer.

## VI.    Procedural History

On March 5, 2020, Plaintiffs filed the original Complaint in the present case. In the operative Amended Complaint, Plaintiffs allege FTCA claims against the Government for trespass and nuisance. On October 13, 2020, the Government filed a Motion to Dismiss for Lack of Subject Matter Jurisdiction. On April 22, 2021, the Court issued a Memorandum Opinion and Order in which it granted the Government's Motion as to Plaintiffs' requests for pre-judgment interest and injunctive relief but otherwise denied the Motion.

7

## DISCUSSION

In their pending Motion for Summary Judgment, Plaintiffs seek summary judgment in their favor as to all of their claims. In its Cross Motion for Summary Judgment, the Government seeks summary judgment in its favor on all of Plaintiffs' claims.

## I.    Legal Standards

### A.    Summary Judgment

Under Rule 56, the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is "genuine" only if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248–49.

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Philip Morris, Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir. 1997)).

### B.    FTCA

The FTCA grants jurisdiction to federal district courts over cases in which a plaintiff's claim is made (1) "against the United States," (2) "for money damages," (3) based on "injury or

8

loss of property, or personal injury or death," (4) caused by the negligent act "of any employee of the Government," (5) acting within the scope of employment, and (6) "the United States, if a private person, would be liable" under the law of the place where the act occurred. 28 U.S.C. § 1346(b)(1); *Kerns v. United States*, 585 F.3d 187, 194 (4th Cir. 2009). Under the FTCA, federal courts apply "the law of the place where the act or omission occurred." *See* 28 U.S.C. § 1346(b)(1); *Cibula v. United States*, 551 F.3d 316, 319 (4th Cir. 2009) (quoting 28 U.S.C. § 1346(b)(1)). The parties agree that Maryland law applies to this FTCA action.

## II.    Trespass

Both parties seek summary judgment in their favor on Plaintiffs' trespass claim. Under Maryland law, a claim for trespass arises "[w]hen a defendant interferes with a plaintiff's interest in the exclusive possession of the land by entering or causing something to enter the land." *Exxon Mobil Corp. v. Albright*, 71 A.3d 30, 94 (Md. 2013) (quoting *Rosenblatt v. Exxon Co., U.S.A.*, 642 A.2d 180, 189 (Md. 1994)). A trespass claim "requires that the defendant must have entered or caused something harmful or noxious to enter onto the plaintiff's land." *Id.* The Government does not contest that the USAF, by dropping one of the external fuel tanks onto the Property, "caused something harmful or noxious to enter" Plaintiffs' land. *Id.* Accordingly, the Court will grant summary judgment to Plaintiffs on the issue of liability for trespass.

The Government, however, seeks summary judgment in its favor on the issue of damages. On a trespass claim, a plaintiff may seek damages for harm to real property as measured by either (1) the permanent diminution in value, which is the difference between the fair market value of the property immediately before and after the trespass; or (2) the cost of restoration if the cost is not disproportionate to the diminution in value or if the plaintiff has proven a personal reason for restoring the property to its original condition. *See Regal Constr. Co. v. W. Lanham Hills Citizen's*

*Ass'n*, 260 A.2d 82, 83–84 (Md. 1970); Md. Civil Pattern Jury Instructions 16:2 cmt. A (2020). A plaintiff also may recover additional, separate damages for the loss of enjoyment as measured by the loss of the "usable value of his property and any consequential damages incurred" so long as the damages are not duplicative of those for restoration or diminution in value. *Exxon Mobil*, 71 A.3d at 89, 90–91. The Government argues that there is no evidence of recoverable damages because it voluntarily remediated the damage to the Property and restored it to its prior condition at no cost to Plaintiffs, and the evidence is insufficient to establish a permanent diminution in the value of the Property or a loss of enjoyment or use of the Property.

### A.     Diminution in Value of the Property

Plaintiffs primarily seek damages based on an alleged diminution in the value of the Property. For purposes of a trespass claim, the diminution in the value of real property is measured by the difference in the fair market value of the property before and after the trespass. *Regal Constr. Co.*, 260 A.2d at 83–84. However, damages for the diminution in the value of real property are available only where the injury to real property is "permanent in nature." *Exxon Mobil*, 71 A.3d at 89. Injury to real property is permanent where the property is so seriously and permanently injured that it cannot be restored to its former condition. *See Piedmont & George's Creek Coal Co. v. Kearney*, 79 A. 1013, 1019–20 (Md. 1911). Plaintiffs assert that the permanent injury consists of continuing contamination of the soil and groundwater at the Property that warrants damages for the diminution in value of the Property. Plaintiffs base this claim on the expert testimony of Wildman, who has offered the opinions that there were chemical contaminants at depths below 14 feet, that as a result "there's no way that contaminant levels were below MDE clean-up standard immediately after cleanup at a depth of only 9 feet," that the chemicals are still present and poisoning the groundwater, and that the toluene detected at the well on the Adjacent

10

Property traces back to the external fuel tank that landed on the Property.  Wildman Report at 2.

They argue that, at a minimum, Wildman's testimony creates a genuine issue of material fact on

whether the Property has been permanently injured.

### 1.    Admissibility of Expert Opinion

As a threshold matter, the Government asserts that Wildman's expert opinions should be

excluded under Federal Rule of Evidence 702 because:  (1) Wildman lacks the qualifications

necessary to render an expert opinion on chemical contamination; and (2) Wildman's expert

opinion on the state of chemical contamination at the Property is not reliable under Rule 702.

Under Rule 702, a witness who is qualified as an expert by knowledge, skill, experience, training,

or education may testify in the form of an opinion or otherwise if:  (1) the expert's scientific,

technical, or other specialized knowledge will help the trier of fact to understand the evidence or

to determine a fact in issue; (2) the testimony is based on sufficient facts or data; (3) the testimony

is the product of reliable principles and methods; and (4) the expert has reliably applied the

principles and methods to the facts of the case.  Fed. R. Evid. 702.  In *Daubert v. Merrell Dow*

*Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the United States Supreme Court held that in order

for expert testimony to be admissible, it must be both reliable and relevant.  *Id.* at 590–91.

A witness's qualifications are "liberally judged by Rule 702."  *Kopf v. Skyrm*, 993 F.2d

374, 377 (4th Cir. 1993).  To be qualified as an expert, a witness must have "knowledge, skill,

experience, training, or education" on the issue upon which the opinion is offered.  Fed. R. Evid.

702; *Kopf*, 993 F.2d at 377.  Because an expert who is qualified in one field is not necessarily

qualified to offer opinions in a related but different area, "[w]hether a witness is qualified can only

be determined by the nature of the opinion he offers."  *Gladhill v. Gen. Motors Corp.*, 743 F.2d

1049, 1052 (4th Cir. 1984).  Notably, "[o]ne knowledgeable about a particular subject need not be

precisely informed about all details of the issues raised in order to offer an opinion." *Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir. 1989).

Wildman is an environmental consultant at Forenvicon, Inc., a company which provides expert consultant services on issues such as forest management and conservation, land design and development, wetlands delineation and mitigation design, stream assessment and restoration design, and wildlife and riparian habitat enhancement. Wildman is a wetland scientist, forester, surveyor, land planner, and landscape architect, and he holds an associate's degree in Forest Technology and bachelor's degrees in Biology and Business Administration and Management. He has several professional certifications, including certifications as a Registered Environmental Manager and Qualified Professional Wetland Delineator and a certification from the Maryland Department of Natural Resources relating to forestry services. Wildman testified during his deposition that he considers himself to be an expert in forestry, wetlands, highway noise, noise mitigation, Phase I environmental site assessments, reforestation, stream restoration and mitigation, and wetlands mitigation. Wildman also has experience conducting Phase II environmental site assessments.

While Wildman is certainly qualified to serve as an expert witness on certain matters, he has limited experience, if any, on the core issues in this case: whether the Property remains subject to chemical contamination and whether the presence of chemicals constitutes permanent injury to the Property. In his deposition, Wildman acknowledged that he does not have expertise in environmental cleanup following a fuel spill. Indeed, Wildman has not previously worked on, or served as an expert witness on, any projects involving the evaluation of the subsurface impact of a fuel spill. Although Wildman's work on Phase I and II environmental assessments may have caused him to identify a need for and to recommend soil or groundwater testing for hazardous

12

materials, he has never conducted such testing and instead refers such issues to other experts and will "defer" to them on such matters. J.R. 476.

Based on this record, which demonstrates that Wildman, at most, has expertise in identifying a need for an assessment of whether chemical contamination of soil or groundwater exists, the Court finds that he lacks sufficient background on the actual conduct and analysis of such testing, including interpretation of the results, to render an expert opinion on the specific questions in this case relating to chemical contamination. Thus, to the extent that Plaintiffs rely on Wildman to provide an expert opinion on the issues of whether the soil and groundwater presently contain contaminants at levels above the MDE clean-up standards and that are present to the point of constituting a permanent injury to the Property, and whether the toluene traces back to the external fuel tank, the Court finds that Wildman lacks the qualifications on those issues to provide such opinions.

Even if the Court were to find Wildman qualified to provide expert opinions on these issues, the expert opinions must also be sufficiently reliable within the meaning of Rule 702 in order to be admissible. As to the question of reliability, courts consider whether the expert opinion is "based on sufficient facts or data"; whether it is "the product of reliable principles and methods"; and whether "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(b), (c), (d). Court also may consider the following additional factors:

> (1) whether a theory or technique can be or has been tested; (2) whether it has been subjected to peer review and publication; (3) whether a technique has a high known or potential rate of error and whether there are standards controlling its operation; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community.

*Hickerson v. Yamaha Motor Corp.*, 882 F.3d 476, 480–81 (4th Cir. 2018) (quoting *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001)); *Daubert*, 509 U.S. at 593–94; *Kumho Tire*

*Co., Ltd., v. Carmichael*, 526 U.S. 137, 149–50 (1999) (stating that courts may, but are not required

to, consider these factors). These factors are "neither definitive, nor exhaustive," and "particular

factors may or may not be pertinent in assessing reliability, depending on the nature of the issue,

the expert's particular expertise, and the subject of his testimony." *Cooper v. Smith & Nephew,*

*Inc.*, 259 F.3d 194, 199–200 (4th Cir. 2001). The proponent of the expert testimony must establish

the admissibility requirements by a preponderance of the evidence. *Bourjaily v. United States,*

483 U.S. 171, 175 (1987).

Here, Plaintiffs have not demonstrated that Wildman had sufficient facts and data and used

reliable principles and methods to reach his conclusions. Wildman primarily relied on test results

provided by Earth Data, which have not been provided to the Court, which he describes as showing

the presence of "numerous VOC's and PAH's" at the landing site at levels 14 feet below the

surface, or approximately five feet below the level of testing conducted by the Contractor. At a

first level, with respect to the reliability of the data, Wildman acknowledged during his deposition

that, although he stated in his expert report that all soil and groundwater samples were taken

·"according to proper standard operating procedures and guidelines," Wildman Report at 1, he did

not actually review the standard operating procedures and guidelines for taking such samples.

Wildman also stated that he was unsure whether Earth Data, while taking the samples, took steps

to consider the potential for cross-contamination, as recommended by the EPA. Because Wildman

did not conduct the testing himself and lacked knowledge of the manner in which the testing was

conducted, the Court cannot conclude that the data he relied upon was obtained by reliable

principles and methods. *Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d

334, 343–44 (D. Md. 2011) (finding that an expert's opinion was not based on sufficient facts and

data where the report relied upon by the expert witness was not included in the record and the court was unable to review its reliability).

More significantly, even if the secondhand data on which Wildman relied is accurate, Plaintiffs have also not demonstrated that Wildman's conclusions were based on sufficient facts and data and reliable methodology. Although he has asserted that certain chemicals can be found at the landing site 14 feet below the surface or lower, he then concluded that as a result of those findings "there's no way that contaminant levels were below MDE clean-up standards immediately after cleanup at a depth of only 9 feet." Wildman Report at 2. Wildman provides no analysis of what chemicals were present, at what levels, and how scientifically it can be inferred that certain amounts located at a certain depth necessarily establish whether the chemical presence was above or below the MDE standards at the original testing depth.

Likewise, Wildman cites test results showing the presence of cyclohexane, methylcyclohexane, and total xylenes in the groundwater 26 feet below the surface that were below MDE and EPA limits as supporting the conclusion that the same contaminants must still be in the soil above that level, and that they are present at levels above those standards and are poisoning the groundwater. Again, Wildman provides no analysis in support of this conclusion, whether quantitative or qualitative, that explains how he determined that the same chemicals would be present above MDE or EPA standards at the higher depth based on this limited data. He also acknowledged during his deposition that his claim that the chemicals may have seeped into the groundwater and then into neighboring wetlands was based only on a "gut feeling" and speculation. J.R. 505.

On the issue of the toluene found at well on the Adjacent Property, Wildman asserted in his expert report that toluene is a "highly toxic and banned chemical." Wildman Report at 1.

However, during his deposition, after being asked for the basis of this conclusion, Wildman stated, "Well, I looked up toluene on the internet . . . I just [G]oogled it." J.R. 519. When asked whether there was a particular document or reference that he reviewed, Wildman stated that he was just "reading up on a whole lot of different things that [he] Googled" and that it was "pretty common knowledge." *Id. Cf. In re Lipitor (Atorvastatin Calcium) Marketing, Sales, Practices and Products Liability Litigation*, 174 F. Supp. 3d 911, 935 (D.S.C. 2016) (excluding an expert witness's testimony in part because the expert failed to conduct a systematic literature search and had no methodology for what studies to consider or disregard). With respect to his conclusion that the toluene on the Property may have flowed from the landing site on the Property to the Adjacent Property, Wildman acknowledged that this conclusion was based on "pure speculation." J.R. 492. Indeed, Wildman did not measure or consider the variance in the surface elevations between the landing site and the well to determine whether the groundwater would actually flow from the landing site in the direction of the Adjacent Property. J.R. 491–92. Notably, he acknowledged in his deposition that Earth Data had conducted such an analysis and concluded that water generally flowed away from the well toward the landing site, and he did not identify any testing he conducted or relied upon to rule out other sources for the toluene, including natural ones. *See Waytec Electronics Corp. v. Rohm and Haas Electronic Materials, LLC*, 255 F. App'x 754, 759 (4th Cir. 2007) (finding that an expert's opinion was not reliable where the expert failed to take serious account of other potential causes); *Casey*, 823 F. Supp. 2d at 346 (noting that an expert offering an opinion on causation "must demonstrate not only that his hypothesis is plausible, but that *it*, and not some alternative hypothesis best explains the event in question") (quoting *Fireman's Fund Ins. Co. v. Tecumseh Products Co.*, 767 F. Supp. 2d 549, 555 (D. Md. 2011)). *Cf. Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 201 (4th Cir. 2001) (finding that an expert's testimony was properly

16

excluded where the expert merely inferred that a medical product caused the plaintiffs' injuries without providing data underlying his conclusions that supported such a causal link).

Where Wildman was unable to identify a reliable source for his conclusions, often referring to his own speculation or gut feelings, the Court cannot find that Wildman's opinions are based on sufficient facts and data and on reliable principles and methods. *Moore v. Equitrans, L.P.*, 27 F.4th 211, 223–24 (4th Cir. 2022) (finding that expert testimony was excludable where the expert did not conduct the calculations underlying his conclusions, relied on "unexplained assumptions," and was unable to answer basic questions about how he came to those conclusions); *Cavallo v. Star Enterprise*, 100 F.3d 1150, 1159 (4th Cir. 1996) (finding that the district court properly excluded expert testimony where the bases of the opinions were not sufficiently established and the opinions were thus largely based on speculation). The Court therefore finds that, based on a lack of sufficient qualifications and the lack of reliability of the opinions, it will exclude Wildman's expert testimony, in particular his opinions that chemical contaminants at the landing site remain present at levels that exceed MDE and EPA levels and are poisoning the groundwater, and that the toluene discovered at the well traces back to the external fuel tank.

In the absence of Wildman's testimony, Plaintiffs lack sufficient evidence to demonstrate any permanent injury to the Property based on environmental contamination. What remains is Ace Environmental's report that the "soil sampling results indicated that the soil samples collected were below MDE standards," J.R. 336, and Dr. Hennet's report that there is "no data to indicate persisting soil contamination from the release of fuel at the landing site," J.R. 193. Based on this evidence, there is no genuine issue of material fact on whether there is sufficient environmental contamination of the Property to constitute a permanent injury as is necessary to support damages based on diminution in value.

17

### 2.   Contamination

Even if the Court were to consider Wildman's expert testimony, it is still insufficient to establish a genuine issue of material fact on whether the Property has sustained a permanent injury from the incident. At most, Wildman has opined that there remain certain chemical contaminants more than 14 feet below the surface at the landing site in unspecified amounts without demonstrating that they came from the external fuel tank or that they pose a threat to health and safety. *See Miller v. Mandrin Homes, Ltd.*, 305 F. App'x 976, 979–80 (4th Cir. 2009) (finding in a contamination case that an expert's testimony that the detection of certain chemicals in water from the sump at the property was "indicative" of groundwater contamination was insufficient to allow a reasonable jury to conclude that there was actually groundwater contamination on the lot when it was owned by the defendants). Although he also claims that there are contaminants in the groundwater, he acknowledges that they are below MDE and EPA levels. Regardless of the specific amounts of any chemicals and their location, Wildman acknowledged at his deposition that he has no actual data that would show that there is any current threat to human health or the environment on the Property. Likewise, he has acknowledged that he is unaware of any way in which the presence of any of the identified chemicals 14 feet below the surface would prevent any particular use of the Property, including the development of an assisted living facility, which would likely use the public water supply rather than rely on wells to be drilled on the Property.

As for the toluene, although the testing has provided specific data on the amount of toluene found at the well on the Adjacent Property, only 4.4 micrograms of toluene per liter of water were present. Under federal and state law, the maximum contaminant level for toluene is 1,000 micrograms per liter for the water to be considered safe to drink. Plaintiffs have therefore not

demonstrated how this level could present any risk to human health or create a permanent injury to the Property.

Moreover, Plaintiffs have failed to present sufficient evidence to support a finding that the toluene traces back to the landing site in the first place. Notably, Dr. Hennet has asserted that the presence of the toluene is not indicative of contamination by fuel from the landing site because when toluene is present in jet fuel, it is accompanied by other chemicals, including benzene, ethylbenzene, xylenes, and naphthalene, none of which were found in the affected groundwater samples, and he identified other potential sources of the toluene, including natural decomposition of organic matter in the well. He also determined that the topography is such that the water would flow from the well site toward the landing site. By contrast, Wildman has offered no basis to refute these conclusions and instead acknowledged that the conclusion that the toluene flowed from the landing site to the well is based on "speculation." J.R. 492.

In the absence of evidence supporting the conclusion that there are chemicals present in the soil or groundwater at locations and at levels that pose a risk to human health or life, the Court finds no genuine issue of material fact on the issue of whether there the Property sustained a permanent injury that would establish damages based on diminution in value. In *Exxon Mobil*, in which the plaintiffs sought damages for the diminution of the value of their properties after a fuel spill contaminated certain wells used for drinking water, the court held that plaintiffs who lacked detectable contamination in the wells serving their properties could not recover for diminution in value on either a trespass or nuisance claim even though there was arguably some contamination of an aquifer that may or may not reach the plaintiffs' property at some time in the future. 71 A.3d at 93–94. The court so ruled even though the plaintiffs ended up using bottled water and reduced the use of outdoor spaces, because there was no determination that their well water was unsafe for

19

use. *Id.* at 95–96. Here, where there is no evidence of soil contamination below the surface having any impact on the safe use of the Property, no evidence of groundwater contamination at any unsafe levels, and the Property does not use and would not be expected to use well water, the Court finds insufficient evidence of any permanent injury to the Property that could support damages for diminution in value. *See id.* These facts do not demonstrate the kind of permanent injury to the land that can support a damages claim for diminution of value. *See, e.g., Piedmont*, 79 A. at 1013–14, 1019 (finding that where the defendant mining company failed to install sufficient support structures and the surface of the plaintiff's land collapsed and was now unstable and did not support a house, the plaintiff had established permanent injury to his property); *Mayor & City Council of Havre de Grace v. Maxa*, 9 A.2d 235, 242 (Md. 1939) (finding that the plaintiffs had demonstrated permanent injury to their property where the defendant caused the plaintiffs' waterway to be filled such that the plaintiffs were permanently deprived of the use of the waterway). Accordingly, the Court finds that Plaintiffs have not established a genuine issue of material fact as to whether the Property sustained a permanent injury.

### B.     Loss of Usable Value

Plaintiffs also seek damages for the loss of the usable value of the Property. A plaintiff may recover damages for the loss in the "usable value" of property and any consequential damages incurred. *Exxon Mobil*, 71 A.3d at 89. "Usable value" consists of the value of the "the personal enjoyment and use by the plaintiffs as occupiers of the premises, independently of the difference in market value." *Id.* at 91 (quoting *Mayor & City Council of Havre de Grace*, 9 A.2d at 242). For example, in *Mayor & City Counsel of Havre de Grace*, the plaintiff was permitted to recover as "usable value" damages for the boat storage and wharf fees it paid because it was deprived of

the use of its dock when the town improperly dumped fill material on his property and cut off his access to the water. 9 A.2d at 242.

Here, Plaintiffs have provided no evidence demonstrating that any present use of the land was adversely impacted by the alleged presence of contaminants below the surface of the landing site. Plaintiffs instead appear to seek damages for the loss of usable value based on their claim that they intended to develop the Property as an assisted living facility but were unable acquire the various parcels of land and secure a special exception to the zoning law, the same theory underlying their damages claim based on diminution in value. It is undisputed, however, that at the time of the fuel tank incident, Plaintiffs was not operating an assisted living facility and had not yet obtained 25 acres of contiguous land or even applied for the special exception needed to develop the facility. Plaintiffs thus did not lose the ability to engage in any existing use of the Property. Even if it had an operating assisted living facility on the Property, as discussed above, there is insufficient evidence that there is any contamination at or near the Property that has prevented the use of the Property for that purpose. *See supra* part II.A.2. Accordingly, without evidence that Plaintiffs lost the ability to use the Property for any existing use at the time of the incident, the Court will grant summary judgment to the Government on Plaintiffs' claim for damages based on a loss of usable value of the Property. Thus, while the Court will grant summary judgment to Plaintiffs on the issue of liability, which is undisputed, it will grant summary judgment to the Government on the issue of damages on the trespass claim.

## III.   Nuisance

The parties each seek summary judgment on the nuisance claim. A claim for nuisance is predicated on "a nontrespassory invasion of another's interest in the private use and enjoyment of land." *Wietzke v. Chesapeake Conf. Ass'n*, 26 A.3d 931, 943 (Md. 2011) (quoting *Rosenblatt*, 642

21

A.2d at 190). A nuisance claim requires that a plaintiff "establish an unreasonable and substantial interference with his or her use and enjoyment of his or her property, such that the injury is 'of such a character as to diminish materially the value of the property as a dwelling . . . and seriously interfere with the ordinary comfort and enjoyment of it.'" *Exxon Mobil*, 71 A.3d at 94 (quoting *Wash. Suburban Sanitary Comm'n v. CAE-Link Corp.*, 622 A.2d 745, 759 (Md. 1993)). If the nuisance is temporary, a plaintiff may recover damages for the loss of use or enjoyment of the property; if the nuisance is permanent, a plaintiff may recover damages for the difference in "the fair market value of the property" before and after the injury, as well as the loss of use or enjoyment. *Hall v. Lovell Regency Homes Ltd. P'ship*, 708 A.2d 344, 355 (Md. Ct. Spec. App. 1998); Md. Civil Pattern Jury Instructions 20:5 cmt. A.

Here, where the alleged source of the harm is the fuel from the external tank that landed on the Property, Plaintiffs have not identified any nontrespassory invasion of its use or enjoyment of the Property. There is no claim that the second external tank, which landed on another parcel of land, has had any adverse impact on the Property. To the extent that the nuisance claim could be based on the toluene found in the groundwater on the Adjacent Property, that claim fails both because Plaintiffs' theory is that the toluene originated with the jet fuel from the external tank that landed on the Property and thus is not actually nontrespassory, and because, as discussed above, there is no evidence that the trace amount of toluene at the bottom of the well has any adverse impact on the Property or the use or enjoyment of it. In turn, the lack of evidence that the toluene is causing any harm also precludes a finding of any damages arising from such a nontrespassory invasion. *See supra* part II.A.2. In particular, where the evidence does not support a finding of a nontrespassory invasion causing a permanent nuisance, the Court cannot award damages for the

difference in "the fair market value of the property" before and after the injury, as sought by Plaintiffs. *See Hall*, 708 A.2d at 355.

Accordingly, the Court will deny Plaintiffs' Motion for Summary Judgment on the nuisance claim and grant the Government's Cross Motion for Summary Judgment on the nuisance claim.

## CONCLUSION

For the foregoing reasons, the Cross Motions for Summary Judgment will be GRANTED IN PART and DENIED IN PART. Plaintiffs' Motion will be granted as to liability on the trespass claim and will be otherwise denied. The Government's Motion will be granted as to damages on the trespass claim and as to liability and damages on the nuisance claim. A separate Order shall issue.

Date:   June 28, 2023

THEODORE D. CHUANG
United States District Judge